Whitaker, Judge,
dissenting in part:
I am unable to agree with the treatment by the majority of what is called Claim B. This claim is for the recovery of $17,489.47 which the Government deducted on account of the elimination of crushed stone and sisal paper underneath the concrete floor of the warehouse.
Whether or not the Government was entitled to deduct this sum, depends upon whether or not crushed stone and sisal paper were called for. One of the drawings did call for crushed stone and sisal paper. Another drawing called for crushed stone, and still another indicated a layer of something below the concrete slab but did not indicate the contents of this layer.
Now the contract provides, as the majority opinion recognizes, that anything required either by the drawings or specifications should be of like effect as if required by both. On the other hand, the contract says that where there is a conflict between the drawings and specifications, the specifications shall govern.
I see no conflict between the drawings and the specifications. The specifications called for compaction of the earth beneath the concrete slab and said nothing about putting crushed stone on top of the compacted earth; but the drawings did call for crushed stone on top of the compacted earth. I see no conflict here. There is nothing inconsistent in requiring earth to be compacted and requiring also that crushed stone be placed on top of the compacted earth.
The drawings having called for crushed stone, I think the contractor was required to put crushed stone on top of the earth. If there was any doubt in his mind about this requirement, he should have consulted the contracting officer *165 and asked for his interpretation of the contract documents. He did not do so but, either inadvertently or purposely, he omitted from his bid anything for this item. That was his own fault — something he could have avoided by consulting the contracting officer in advance. When, therefore, the Government eliminated this item from the contract requirements, it properly reduced the contract price by the cost of putting this crushed stone underneath the slab.
It does not seem to me that the fact the character and size of the crushed stone were not specified presents any great difficulty. Of course, the drawings could not be construed to require boulders or large stone underneath the slab; they called for the crushed stone which ordinarily is used for such purpose. The amount by which the contract price was reduced was the cost, I presume, of the use of crushed stone which is ordinarily used for this purpose.
I do not think plaintiff is entitled to recover for this item.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs, Ellard G. Conn and Victor Conn, were at all times a partnership trading under the firm name and style of Conn Structors. They will be hereinafter referred to as the plaintiff.
2. Under date of July 17,1951, plaintiff entered into a contract with defendant through the Department of the Navy. Said contract, identified as NOy-27276, was for the construction of a warehouse at Cherry Point, North Carolina. The contract included specifications and drawings, and was duly supported by performance and payment bonds.
3. Pursuant to Article 7 of the contract, plaintiff duly assigned to the Cheshire National Bank of Keene, New Hampshire, all its rights, title and interest in and to all moneys due and to become due plaintiff under the contract, as collateral security for loans made to plaintiff.[1]
*166 4. Plaintiff was awarded the contract by the Navy’s Bureau of Yards and Docks after plaintiff had submitted the lowest bid of six bidders. Plaintiff’s bid was $1,288,251. Other bids were in the amounts of $1,357,486, $1,424,800, $1,478,119, $1,503,750, $1,950,000. The Government’s prebid estimate of the contract cost was $1,300,000.
5. The contract provided that the work was to be commenced July 17,1951, and be completed April 12, 1952, a period of 270 days, and that thereafter liquidated damages at the rate of $300 a day would accrue. Such date of completion was duly extended by modifications to the contract, evidenced by Change Orders A through J, pursuant to which the contract time was extended 319 days or until March 5, 1953, at which time the contract was accepted as usably complete. No liquidated damages were assessed against plaintiff because plaintiff completed the contract within the time extended by the change orders.
6. During the early part of the contract performance period it became apparent that the subsurface conditions encountered and to be encountered differed radically from those which the defendant had anticipated on the basis of the soil tests and upon which the specifications had been based. The actual conditions caused substantial changes in the pile-driving phase of the contract and sharp reductions in the amounts of excavation and borrow fill. The plaintiff’s petition presents Claims A, B, C and D. Claim D was withdrawn during trial and will not be considered here. Claim A relates to additional overhead and expenses allegedly flowing from the disruption of plaintiff’s overall work schedule occasioned by the changed subsurface conditions, for which plaintiff claims it was not reimbursed. Claim B relates to an allegedly wrongful reduction of the contract price by $17,808.89 through the elimination from the contract of items which the plaintiff claims were not within contract requirements, namely, the placement of crushed stone and sisal paper under the concrete floor slab. Claim C relates to an allegedly erroneous computation of the excavation and fill quantities for which plaintiff claims to have been underpaid. The plaintiff signed a release incorporating certain exceptions. The defendant contends the plain *167 tiff released all claims except Claim B. Succeeding findings provide the details of the respective contentions.
CLAIM A
DAMAGES CONSEQUENTIAL TO SUBSURFACE CONDITIONS
7. The warehouse to be erected was a steel and concrete structure whose foundation rested on piling which was to be driven as a contract item. The building was 801% feet long by 191% feet wide. One of the early items in plaintiff’s contract was the driving of 1,021 composite piles. The specifications provided that the piles should each be composed of a lower section of wood spliced at the top to a steel cylinder into which concrete was to be poured, and that in no case should the extreme top of the wood sections be above cutoff elevations. The specification length of the wood sections of the piles from their points to the splices with the concrete-filled steel cylinders was 65 feet. Under the specifications plaintiff was first required to drive ten wood test piles, each 80 feet long, which were accepted as part of the completed work. The specifications provided for an adjustment in the contract price and/or time for completion, if the total lengths and number of piles varied from those specified.
8. When the plaintiff commenced its excavation it became apparent that the soil was more stable than had been anticipated on the basis of the defendant’s precontract soil tests. Accordingly, on September 21, 1951, a Board on Changes (consisting of two representatives of the defendant and one of the plaintiff) unanimously recommended to the Contracting Officer that there be eliminated from the contract approximately 87,000 cubic yards of excavation and a corresponding amount of borrow fill. On April 16, 1952, revised Change Order B was signed and accepted by the. plaintiff, directing the omission of 28,448 cubic yards of excavation and 40,380 cubic yards of fill, arid decreasing the contract price by $62,-984.16. ' ' -
9. Greater stability of soil than was originally contem-, plated, corroborated by the ten test piles .'driven by-plain-, tiff, showed that the specification length piles (65 féét) were *168 much longer than necessary. The plaintiff submitted to the defendant on October 31, 1951, a schedule showing the revised lengths of piles to be required under the changed soil conditions. On November 2, 1951, the Contracting Officer approved the proposed schedule with certain modifications, and requested the plaintiff to submit an itemized cost breakdown for the purpose of determining the credit due the defendant for the difference in material and labor between the bid price and the actual price of the shortened piles. This letter recognized that there would be some uncertainty as to the depths to which each pile would be driven before reaching required bearing strength, and that each pile would necessarily be used as a test pile for each succeeding pile. On November 6, 1951, the plaintiff requested that a change order be issued to provide extra reimbursement for difficulties anticipated in the driving of piles under the changed conditions, and contended that the use of shorter piles would not entitle the defendant to a credit against the bid price. On December 14, 1951, the Contracting Officer rejected the plaintiff’s contention that no credit was due the defendant for the shorter length piles, and stated that a Board on Changes would determine the difference. The letter recognized the difficulties attendant upon driving piles under the changed conditions, but stated that the design and driving of piles so as to meet contract requirements was the plaintiff’s responsibility. On January 27, 1953, the Contracting Officer issued a unilateral Change Order F deducting $23,222.01 from the contract price for the use of shorter piles. The plaintiff never consented to such deduction and claimed reimbursement therefor on its subsequent application of October 4, 1954, for reimbursement of “added costs directly attributable to the piling change.” This sum was eventually remitted to plaintiff as part of the payment provided by Change Order J of March 10,1955 (findings 37,38, infra,).
10. The pile-driving phase of plaintiff’s contract performance was not completed until mid-April 1952 instead of October 15, 1951, as provided by the original schedule. The delay in this phase of the work was caused primarily by technical difficulties inherent in driving composite piling *169 to shallow depths, involving the use of unusually short wood sections of the piling. Instead of the specification length of 65 feet, 72 percent of the wood sections installed by plaintiff were seven feet or less in length, while none of them were longer than 15 feet. In the normal driving of composite piles the wooden section is first driven to a point where its upper end is a few feet above ground elevation. Then a metal tube is spliced to the upper end of the wood section, a mandrel is inserted into the tube, and the composite pile is driven to bearing elevation by the piledriver hammer. Upon reaching bearing elevation the mandrel is withdrawn, the metal tube is cut off to proper length, and it is then filled with concrete. Because the wood sections of the composite piles in the subject contract were abnormally short, the plaintiff’s piling subcontractor could not follow normal procedure. Instead he had to preassemble the wood and steel sections before placement for driving, and then drive the assembled pile as a unit. This resulted in excessive wastage of wood sections, unusually long steel sections, extra personnel and equipment for preassembly of the wood and steel sections, overdriving and damage to the wood sections, and technical difficulty in maintaining proper alignment and lateral stability in driving the composite piles as units.
11. By letter dated October 4, 1954, the plaintiff claimed $65,741.53 as reimbursement for “added costs directly attributable to the piling change.” By letter dated October 19, 1954, the plaintiff claimed reimbursement of $262,531.53 for increased cost of performance based on purported disruption of construction schedule “Due to changes in the excavation, fill and piling work and also the late deliveries of priority governed materials * * Claim A in plaintiff’s petition reduced this latter claim to $246,947.26, and at trial the plaintiff reduced this claim to $197,148.[2] The administrative treatment of these claims is dealt with in findings 29, et seq., infra. While the plaintiff was delayed in the pile-driving phase of the work due to subsurface conditions, performance of the contract as a whole was also *170 delayed by lack of steel and by inadequate supervision and equipment on the job, as described in the following findings 12, and 13.
12. If the plaintiff had completed the pile-driving by October 15, 1951, as originally scheduled, it would have been unable to proceed immediately with the placement of reinforcing and structural steel, which operations were originally scheduled to start on September 1 and November 10, 1951, respectively. Fabricated steel was then subject to wartime allocations. Plaintiff received its first shipment of reinforcing steel sometime after December 20, 1951, and its first structural steel after April 20, 1952. Plaintiff failed to establish that it could have obtained its steel requirements sooner, if needed, by paying higher prices. By Change Order C the plaintiff was given an extension of 120 days to October 19,1952, “for delays in procurement beyond the control and without the fault or negligence of the contractor.”
13. In May and June 1952 the Contracting Officer sent numerous written complaints to the plaintiff alleging improper supervision since the beginning of the contract, absences from site of plaintiff’s representatives, plaintiff’s failure to furnish shop drawings on time, improper placement and compaction of fill, negligent damage to anchor bolts in concrete piers, improper storage of and consequent damage to reinforcing mesh, delay in commencing masonry work, failure to restore certain paving, and maintenance of hazardous conditions. The letter of June 13, 1952, stated that “As of this date, the loss of time on this project due to improper management has been intolerable.” The Contracting Officer’s letter to plaintiff of September 4, 1952, threatened to terminate the contract for inadequate supervision and stated that supervisory conditions had deteriorated since the complaints had been made the preceding May.
14. Comparison of the original progress schedule with the schedule of actual progress indicates that in almost every category of work unrelated to pile-driving the plaintiff took substantially more time from start to substantial completion than originally scheduled. It is reasonable to conclude *171 from the record as a whole that, while the pile-driving delays constituted an initial disruption of plaintiff’s progress schedule, delays both subsequent to the completion of pile-driving and concurrent with part of the pile-driving but unrelated to it were the combined product of plaintiff’s inability to secure materials and plaintiff’s mismanagement.
15. a. The parties stipulated that the plaintiff’s total cost of performing the contract, exclusive of subcontracts, profit and bond charge, was $824,217.01, consisting of $240,643.82 for labor, $55,000 for overhead, and $28,573.19 for equipment rental. The plaintiff’s bid was in the amount of $1,288,251, the greater part of which represented work that was subcontracted, but no reliable basis was provided by the plaintiff to compare the actual cost of performing its non-subcontracted work with the same items in its bid. Claim A in plaintiff’s petition demands $197,148 (as revised at trial) for increased cost of performance based on purported disruption of construction schedule allegedly (in the administrative claim) “Due to changes in the excavation, fill and piling work and also the late deliveries of priority governed materials.” The plaintiff had also claimed administratively $65,741.53 as reimbursement for “added costs directly attributable to the piling change.” The record establishes that the plaintiff paid its piling subcontractor $39,744.83 less than the defendant paid the plaintiff for piling work. This $39,744.83 is included in a larger sum of $62,007.44 paid the plaintiff by the defendant under Change Order J of March 21, 1955 (finding 38, infra), for performing “all additional work in connection with piling due to changed conditions differing materially from those originally encountered and provided for in the drawings and specifications.” Plaintiff was unable to explain what the $39,744.83 was for. It is defendant’s contention that it was paid by defendant to plaintiff in recognition of and payment for the damages alleged in Claim A of the petition.
5. E. G. Conn, one of the partners of the plaintiff partnership, was plaintiff’s sole witness throughout the trial, both as to the liability as well as the damage issues. The plaintiff did not offer the testimony of its certified public accountant under whose supervision the plaintiff’s books and *172 records were maintained. Plaintiff’s proof of its damages was inadequate as a basis either for an accurate determination or a finding in the nature of a “jury verdict.” At least, the sum total of damages even remotely established by the plaintiff under Claim A of its petition, exclusive of those contained in Claims B and C, falls far short of the $89,744.83 referred to in paragraph a of this finding, above, which plaintiff was paid and for which it has no explanation.
CLAIM B
CLAIM FOR CRUSHED STONE AND SISAL TAPER
16. The contract specifications make no mention as to what was to be placed beneath the warehouse floor, except as it is to be found in section 2 — “Earthwork.” Subsection 2-01 thereof described the scope of the work required to complete the earthwork as “including warehouse site excavation * * * fill, backfill, compaction * * *.” Subsection 2-02 (captioned “Excavation”), 2-03 (captioned “BorrowPits”), and 2-04 (captioned “Filling, Backfilling and Grading”) are concerned primarily with how excavation, borrow, filling, backfilling and grading operations shall be performed, and 2-02 also states that “After the excavation has been completed the grade shall be rebuilt to the elevations as shown on the drawings with suitable material, from elsewhere in the work or from borrow pits specified elsewhere herein, placed and compacted as required.” Under subsection 2-05 (“Compaction Requirements”) it is explained how in-place densities, when called for, are to be obtained and measured; and 2-05 of the specifications then goes on to state:
The top twelve (12) inches of embankments and back-fill required to support structures, warehouse floors and pavements shall be compacted to a density of ninety-live (95) percent. In addition, embankment under railroad ballast for the width of the ties plus one foot on each side shall also be compacted to a density of ninety-five (95) percent to a depth of twelve (12) inches. Unless otherwise specified, all other fills shall be compacted to ninety (90) percent. In cut areas where the ground will be required to support loads, as mentioned above for fills, the earth shall be compacted to a density of *173 ninety-five (95) percent to a depth of twelve (12) inches.
17. Yards and Docks Drawing No. 499888 entitled “Warehouse Section and Details” (which is one of the drawings listed in and accompanying Specification No. 29416) indicates at two different points thereon the presence of a stone fill between the concrete slab floor of the warehouse and the earth below, and at a third point an unlabeled layer. Thus, the drawing contains a section running across the top entitled “Half Longitudinal Section” which undertakes to portray by means of parallel lines a floor slab labeled “6" cone, slab” and a layer under this slab labeled “6" crushed stone fill,” and by means of crosshatching symbols the earth beneath this latter. Another section of the same drawing entitle “Half Cross Section” again shows this same arrangement of lines and crosshatching but without any accompanying labels, and shows it as extending to the outer edge of what appears to be a loading platform[3] adjacent to but outside the line of the side wall of the warehouse building. And a third section of Drawing No. 499888, one entitled “Typical Wall Section Thru Mezzanine Area” and drawn to a substantially larger scale than in the above-mentioned other sections, presents, starting immediately below a line labeled “Fin. Floor at Door Elev. 26.87,” a graphical arrangement consisting of, and labeled respectively beginning at the top, a “Con. Slab” indicated as 6 inches, “Sisal Paper,” and “Stone Fill” also indicated as 6 inches. Except as above stated, neither stone fill nor sisal paper are indicated on the contract drawings; and there is nothing elsewhere in any of the contract documents to disclose further what manner of stone fill and paper the above-mentioned sections of Drawing No. 499888 may have been intended to indicate. The specifications contain elsewhere complete gradations for crushed stone to be placed in trench backfilling and railroad ballasting.
18. Plaintiff’s bid on the contract did not include any amount for the cost of furnishing ‘and placing crushed *174 stone and sisal paper under the concrete floor slab. Plaintiff made no inquiry of defendant prior to bid as to the significance of the detail on the drawings described in finding 17, and it is concluded that plaintiff simply overlooked the data. The specifications and the drawings were, of course, prepared by the defendant.
19. The contract contains the following provisions:
Article 5. — Specifications And Drawings
(a^ Conflicts — Omissions—Misdescription—Misinfor-mation. — The Contractor shall keep on the work a copy of the drawings and specifications and the Officer in Charge shall at all times have access thereto. Anything mentioned in the specifications and not shown on the drawings or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between the drawings and specifications the specifications shall govern. * * *
$ ‡ $
(e) Interpretations and Instructions. — All questions regarding the figures, drawings, plans, and specifications and the interpretation thereof and the resolving of conflicts and inconsistencies therein shall be determined by the Contracting Officer, and such determination shall be final, subject only to appeal under the provisions of Article 16.
$ $ ‡ ‡ $
Article 16. — Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. * * *.
*175 20. The defendant decided to eliminate from the contract the requirement of crushed stone fill and sisal paper under the floor slab and, on November 20,1951, asked the plaintiff to furnish an estimate of costs to be eliminated from the contract price on that account. On November 26, 1951, the plaintiff was formally directed to eliminate the use of crushed stone fill and sisal paper. The matter of cost had been referred to a Board on Changes, consisting of two representatives of the Navy and plaintiff’s project manager. The Board on Changes considered other matters beside the deductive*- change relating to crushed stone and sisal paper. The plaintiff had submitted to the Board on Changes at least four successive estimates in increasing amounts as the recommended credit to be given the defendant by change order for the elimination of the items in question, the last estimate being in the amount of $17,808.89. On February 18, 1952, the Board on Changes met and found $17,808.89 to be a fair amount to credit the defendant, and recommended the same to the Contracting Officer. On March 13, 1952, after having received a draft of the Board of Changes report, plaintiff’s project manager sent the following letter to the Board on Changes:
We have received the subject report and hereby return two (2) copies to you signed and approved with the following noted exceptions:
Exception No. 1: The contractor does not feel that a credit is due the government in accordance with item (9) under paragraph 4 of the subject report, and hereby objects to this credit item being included in this report.
Reasons: (a) Y and D Drawing No. 499888 shows six (6) inches of stone fill covered by sisalkraft paper under the concrete floor of the warehouse and loading platforms. This stone and vapor barrier is not shown on any other drawing nor is it covered by the specifications.
(b) Section 2-05 paragraph (c) states in part: “The top twelve (12) inches of embankments and backfill required to support structures, warehouse floors and pavements shall be compacted to a density of ninety five (95) percent.”
(c)_ Conn Structors feel that the details on Y & D Drawing No. 499888 were a draftsman’s error and that the stone fill was never required. The fact that the size of the stone, compaction requirements or any spec *176 ifications covering either the stone or the sisalkraf t paper were never furnished strengthens this opinion; while the A and E Contractor specifically required certain compaction requirements for hack fill to support the warehouse floors.
Even though on the 18th of February 1952 at the meeting of the Board on Changes the contractor’s representative agreed and concurred with the findings of the Board, we now having restudied the details and the specifications covering this work we protest and object to this credit being included in this report.
The report has been signed with this exception noted. All the other items covered by the report are approved and accepted by the general contractor.
21. The plaintiff refused to execute a change order deducting $17,808.89 from the contract price. On January 23, 1953, Change Order E was issued unilaterally decreasing the contract price by $17,808.89, and the plaintiff duly appealed to the Armed Services Board of Contract Appeals.
22. On March 31,1954, the Armed Services Board of Contract Appeals denied plaintiff’s contention as to the proper construction of the contract documents, but left open the proper amount of the credit to which the government was entitled. Plaintiff’s motion for reconsideration was overruled. On March 10, 1955, the defendant issued Change Order J under which plaintiff was paid $319.42 as a credit against the $17,808.89 contract price reduction effected by Change Order E, as will be more fully shown in findings 32-38, infra.
claim c
ALLOWANCE FOR EXCAVATION AND FILL
23. Paragraph 2-08 of the contract specifications provided for “removing 57,000 cubic yards of unsuitable material excavation as indicated on the drawings.” Paragraph 2-09 of the same provided for “103,000 cubic yards of borrow excavation [i.e., fill] measured in place by cross-sections taken at fifty (50) foot intervals.”, and for its compaction according to other specifications. Both paragraphs 2-08 and 2-09 provided for an adjustment in contract price for both excavation and fill according to unit prices furnished in plaintiff’s bid.
*177 24 As stated in finding 8, supra, after it was discovered that actual soil conditions differed radically from those which had been expected, a Board on Changes met on September 19,1951, and on September 21 issued a report, unanimously signed, which read in part as follows:
2.Item 1, Soil conditions at the site, as demonstrated by the contractor’s commencement of excavation, differed from those contemplated at the time of award of the contract.
The Resident Officer-in-Charge of Construction, therefore? exercising the prerogative given in the subject specification, directed that the scope of excavation be changed in the approximate amounts of 37,000 cubic yards of cut and a corresponding amount of borrow. The contemplated yardage involved before change of scope was 57,000 cubic yards of cut and 103,000 cubic yards of 'borrow. The remaining approximate quantities are 20,000 cubic yards of cut and 66,000 cubic yards of borrow. The scope of work was reduced by approximately 46%.
To arrive at an equitable basis for settlement, the board agreed, since the change in scope was so large, to credit the contract with the entire excavation and to set up the remaining yardage on a unit price basis. Accordingly, the unit prices used by the contractor on his “Schedule of Prices” were applied as follows:
57,000 cubic yards excavation at $1.50_ $85,500
103,000 cubic yards borrow and fill at $1.00_ 103,000
Total credit to contract price_$188,500
$ $ $ $ $
3.In view of the claims, the board on changes recommends that the unit prices for approximately 20,000 cubic yards of undesirable material excavation, and approximately 66,000 cubic yard's of borrow and fill, remaining in the contract, be set as follows:
Undesirable excavation per cubic yard_$1.72
Borrow and fill per cubic yard_$1.22
4.The board recommends that a change order be so written that the subject contract will be credited in the amount of $188,500, and that in addition to the resultant contract price a unit price of $1.72 per cubic yard for approximately 20,000 cubic yards of undesirable material excavation and a unit price of $1.22 per cubic yard for approximately 66,000 cubic yards of borrow and fill be paid. The amounts of excavation and borrow to be determined by cross sections of cut and of fill in place.
*178 Had! the estimate of the Board on Changes been correct that there would be 20,000 cubic yards of excavation and 66,000 cubic yards of borrow fill, and had the payment of plaintiff been based on these yardages and on the revised unit prices recommended by the Board, the plaintiff would have been entitled to receive $114,920,[4] or $73,580 less than the original contract price of $188,500.
25. On February 4, 1952, Change Order B, altering the price for excavation and fill, was sent to the plaintiff. The plaintiff refused to sign it and made a written appeal to the Chief of the Bureau of Yards and Docks on February 7, 1952. The Chief of the Bureau of Yards and Docks thereupon issued revised Change Order B under date of April 16, 1952, basing such change on the recommendation of the Board on Changes. Revised Change Order B provided for the omission of 28,448 cubic yards of excavation and 40,380 cubic yards of borrow fill and, using the unit prices of $1.72 and $1.22 recommended by the Board on Changes, decreased the contract price by $62,984.16. (N.B.: The Contracting Officer erred arithmetically by $10; the correct figure should have been $62,994.16.) Conversely, the reduction in revised Change Order B indicates that plaintiff removed 28,552 cubic yards of unsuitable material excavation and placed 62,620 cubic yards of borrow fill.
26. Plaintiff signed its acceptance of revised Change Order B without apparent protest or reservation. On May 8,1953, the plaintiff wrote to the Contracting Officer in part as follows:
The cross-sectioning by the Navy, determining the contemplated 103,000 yards of borrow fill and 57,000 yards of unsuitable material for the original contract, was based on 30% compaction. The compaction for the Changed Conditions were premised on 15% compaction. The Contractor is entitled to the actual amount of fill handled, computed by cross-sectioning of the site, plus 30% for compaction requirements.
The additional amount due is in the neighborhood of $18,000.00 and the Contractor is extremely anxious to have these funds made available as quickly as possible.
*179 27. On May 12, 1953, the Contracting Officer advised the plaintiff that, based upon a compaction factor of 25 percent used in arriving at the original specifications and on earthwork yardages computed by plaintiff, the plaintiff had moved a total of 96,617 cubic yards of earth, and unit prices were reduced to $1.65 for excavation and $1.15 for fill. This reduced unit price would have resulted in the plaintiff receiving $130.29 less than it received under revised Change Order B. The record is not clear in the matter, but it appears that the plaintiff was paid the sum provided in revised Change Order B, and there was no further reference to the reduced unit prices announced in the communication of May 12,1953.[5]
28. The plaintiff contends here that the specifications call for a larger amount of cut and fill than the drawings, that the difference establishes the fact that the specification estimates of quantities were based on a compaction factor of 9.7 percent as to excavation and 28.8 percent as to fill,[6] that revised Change Order B makes payment only for actual quantities of cut and fill in place without making any addition for compaction factors, and that the plaintiff has thus been underpaid $13,931.48 for this item. The plaintiff’s sole witness throughout the trial was Ellard G. Conn, one of the partners of the plaintiff company. The problem concerning the compaction factors was one apparently within the special knowledge of one Mr. Jowdy, who was one of plaintiff’s superintendents on the job. Although Mr. Jowdy was said to be available in Baltimore, he was not subpoenaed to testify as a witness for the plaintiff during the closing session of the trial in Washington, D.C. Conn did not have first-hand knowledge sufficient to provide adequate proof or explanation of the compaction factors to the Commissioner, and certain exhibits offered by the plaintiff on the *180 subject were not admitted in evidence because they were unintelligible without explanation by qualified witnesses. The computation of quantities contained in the plaintiffs requested findings, purportedly based upon an application of compaction factors to yardages in place, not only resists the Commissioner’s comprehension, but also is not adequately supported by credible testimony or other appropriate evidence in the record. It is thus concluded, in the absence of proper proof otherwise, that the plaintiff was fully compensated by revised Change Order B for the excavation and fill performed under the contract.
ADMINISTRATIVE PROCEEDINGS ; RELEASE AND EXCEPTIONS; PINAL PAYMENT
29. On various dates in October 1954 the plaintiff wrote letters to the defendant making claims for additional compensation under the contract. Plaintiff’s letter of October 4, 1954, requested an allowance of $65,741.53 for “added costs directly attributable to the piling change.” Plaintiff’s separate letter of the same date asked for an adjustment of the contract price under revised Change Order B relating to compacted earth fill (findings 23-28, supra). Plaintiff also had a claim before the Contracting Officer contained in an undated letter with respect to the crushed stone and sisal paper deducted under Change Order E (findings 16-22, supra). Plaintiff’s letter of October 19, 1954, claimed $262,531.53 as compensation for additional expenses due to disruption of its work schedule on account of “changes in excavation, fill and piling work and also the later deliveries of priority governed materials” (findings 7-15, supra). In addition to the foregoing claims specifically relevant to the present litigation, during this period plaintiff made other written claims for a time extension for installation and removal of a transformer, additional compensation for payment of higher than minimum wages, and extra payment for certain electrical work, none of which is of direct relevance here.
30. With all the foregoing claims before the Contracting Officer, Mr. Conn requested and received a hearing before the Contract Award and Eeview Board in Washington, D.C. *181 The plaintiff now contends that this procedure was contrary to the mandatory procedure of Article 10(a) of the contract, which reads as follows:
Article 10. — Changes and Extras
(a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. Any claim of the Contractor for such an adjustment must be made in writing to the Officer in Charge within 10 days from the receipt of such change order or within such longer period as may be allowed by the Contracting Officer. If the Officer in Charge considers that such change should result in a decrease in the Contractor’s compensation or time for performance or both, he shall so notify the Contractor. In either case, the equitable adjustment shall be made in accordance with the mutual agreement of the parties, provided, however, that if the parties are unable to agree, the Contracting Officer shall determine such equitable adjustment, if any, to be made in the contract terms, and his determination shall be final, subject only to appeal under the terms of Article 16. In making such determination, the Contracting Officer shall, in those instances where the adjustment to be made in compensation is estimated by the Officer in Charge to amount to $10,000 or more, convene, and give full consideration to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contracting Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time, or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 percent shall be added by said board to adjust the Contractor’s profits. In arriving at the. *182 amount of the change in price, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items.
The evidence does not suggest that a board was appointed in accordance with Article 10(a) of the contract quoted above to review the findings of the Contracting Officer. Nor does it suggest that the plaintiff ever requested that such a board be appointed.
31. The Contract Award and Review Board referred to in the preceding finding was a contract adjustment board set up by the Chief of the Bureau of Yards and Docks to make recommendations to him concerning settlement of claims, awards of new contracts, and selection of contractors. The plaintiff appeared before the Board at a hearing lasting two or three days. He conferred with Mr. Walter J. Evans, Assistant Head of the Contract Branch and Assistant Counsel, Bureau of Yards and Docks, who was also a member of the Contract Award and Review Board. Before the Board report was signed, meetings were held with Mr. Conn by Mr. Evans and Mr. William H. Speck, an Assistant Counsel of the Bureau of Yards and Docks. At these meetings Mr. Conn was told that any amount which would be paid plaintiff would be in settlement of all plaintiff’s claims which could be settled administratively under the contract; that he would, as part of the overall settlement, sign a release excepting only (1) claims for damages which the Navy Department had no right to pay under a change order, (2) any right which he might have before Congress, and (3) any right under plaintiff’s stone fill and sisal paper claim which was then pending on motion for rehearing before the Armed Services Board of Contract Appeals.
32. In order to authorize the issuance of a change order to carry out the overall settlement referred to in finding 31, the Contract Award and Review Board issued a report under date of February 17, 1955, in which the Chief of the Bureau of Yards and Docks was advised by the Board that plaintiff should be paid a total of $76,593.74 “as settlement of all claims.” The $76,593.74 was comprised of $62,007.44 “for additional compensation due to changes in piling” ($65,- *183 741.53 less $642.74 already paid and less $3,091.35 further for disallowed engineering), $319.42 “for additional compensation due to the elimination of sisal paper and gravel fill as settlement under [the proceeding then pending before the Armed Services Board of Contract Appeals on plaintiff’s motion for rehearing, the motion being denied April 14, 1955] ”, and other items not relevant here.
33. On March 11,1955, the Contracting Officer conveyed to plaintiff by letter of that date his final decision, reading in pertinent part as follows:
1. Your letter of 4 October 1954 requests $65,741.53 for added costs of piling and $1,175.73 for “X” and “Y” beams. The Contracting Officer finds that subsurface conditions different than those indicated in the contract caused additional work. Your evidence fails to demonstrate what additional work arose from these conditions. However, resolving certain doubts in your favor and in order to effect a full settlement of all your claims payable under the contract, the Contracting Officer also finds that a fair and reasonable price for all additional work attributable to changed conditions is $62,007.44 and that you are also entitled to $1,175.73 for “X” and “Y” beams.
2. Your letter of 4 October 1954 claimed for compacted earth fill. The Contracting Officer finds that Change “B” adjusted the contract price after completion of the grading work to reflect the actual quantities of fill and that you accepted this change. In addition, the Contracting Officer finds no evidence that you placed additional fill. Accordingly, this claim is denied.
3. Your further letter (undated) claims $27,625.18 additional compensation for deletion of crushed stone and sisal paper by Change “E”. The Contracting Officer finds that the deductive amount under Change “E” should be reduced to $17,489.47 to give you a credit of $319.42. The Contracting Officer also finds that laying the floor upon earth should not and did not cause you to perform additional work and that you did not claim these additional costs at the time the Change “E” was ordered as required by Article 10. Accordingly, this claim is denied except for $319.42.
8. Your letter of 19 October 1954 claims $262,531.53 for what are essentially additional overheads incurred during your operations. The Contracting Officer finds *184 that these costs were not the responsibility of the Government under the contract. Accordingly, this claim is denied.
jji
This is a final settlement of all of your claims under the contract, excepting only ASBCA 1499, claims for damages for breach of contract in the courts and rights for relief in Congress. The District Public Works Officer, Fifth Naval District, will prepare a change order _ and release accordingly for simultaneous execution.
34. With reference to paragraph numbered 8 of the preceding letter of March 11, 1955, rejecting the plaintiff’s claim of $262,531.53 covering the same items as those in Claim A of the present petition, the rejection was predicated on the assumption that the standard clauses used in the contract did not permit administrative payment of damage claims for delay.
35. On March 15, 1955, the plaintiff protested the March 11, 1955, final decision of the Contracting Officer by letter reading in part as follows:
1. The sum of $62,007.41 plus $1,175.73 for “X” and “Y” beams is accepted as payment for our claim in the amount of $65,741.53, provided that such acceptance does not prejudice our rights for additional compensation from either a higher authority or the Court of Claims, or relief from Congress.
2. We do not agree that change “B” adjusted the contract price to reflect the actual quantities of fill and that we accepted this change as such. We feel that the purpose of change “B” was primarily to increase the unit price allowable under the contract and that we are entitled to use the same percentage for compaction as is necessary to arrive at the quantities originally determined by the contract.
3. We do not agree with your findings that only the sum of $319.42 is allowable under the contract because of deductive change order “E”.
* * .-J: * Sc
8. We do not agree with your denial of our claim for $262,531.53 for which you claim are essentially additional overheads. A study of the itemization of these costs will show that they are not alone overhead cost but are in fact, in a number of instances, direct job ex *185 penses which we were compelled to pay because of the additional time required for completion of the contract. $ $ $ $ $
This protest is made in accordance with the contract requirements and to prevent any prejudice of our rights for additional compensation either from a higher authority than your office, the Courts, or relief in Congress.
36. Under date of March 17, 1955, by direction of the Officer in Charge of Construction, plaintiff was sent a registered letter enclosing a change order designated “Change Order J”, a final payment voucher, a release to be executed by plaintiff, a release from plaintiff’s assignee, a partnership certificate, and an affidavit to accompany the final voucher.
37. Change Order J referred to in the preceding finding was dated March 10,1955, and provided as follows:
You are directed to perform the following additional work under Contract NOy-27276:
(1) Perform all additional work in connection with piling due to encountering changed conditions differing materially from those originally encountered and provided for in the drawings and specifications_:_$62, 007.44
(2) Modify Change “E” to credit contractor with_ 319.42
(3) Install additional “X” and “X” beams_ 1,175. 73
(4) Furnish the following additional electrical items:
(a) Furnish and install transformer windings-.-$199. 50
(b) Provide No. 2/0 cable in lieu of No. 2_$918.70
(e) Install Government-furnished transformer as temporary transformer installation and later remove same_$572.95
Total Electrical Items- $1, 691.15
For the performance of all the additional work included herein, the contractor’s price is increased in the total amount of $65,193.74 chargeable to Appropriation 17X1205 PWN; Allotment No. 62470/25611 issued to DPWO FIFTHNAVDIST: Expenditure Account 41599; Obj. Class. 103; Activity No. 146, and the contract time for completion is extended 38 calendar days to and including 5 March 1953 due to the performance of the work set forth in Item 4(c) above.
*186 Except as herein modified, the basic contract shall remain in full force and effect.
Yon are requested to indicate your acceptance of this change order in the space provided therefor on the original and three (3) copies, returning the original and two (2) copies to the Officer in Charge of Construction, Public Works Office, Fifth Naval District, U.S. Naval Base, Norfolk, Virginia.
38. On March 21,1955, the plaintiff signed its acceptance of Change Order J and wrote the following letter to the Contracting Officer:
We return herewith the following:
Change “J”
Voucher No. 23
Contractor’s Release
Partnership Certificate
Affidavit to Accompany Voucher
Order Appointing Receiver
Please note that we do not consider Voucher No. 23 as final in that the release provides that we may go to higher authority for monetary damages due to breach of contract on the part of the Government.
The Assignee’s release will be returned under separate cover as that must go to Keene, N.H., for processing.
We are very anxious to have these funds released and would appreciate your expediting same immediately. We trust that it will not be necessary for you to wait on the Assignee’s release before starting to process payment.
The $62,007.44 provided by the change order for changed conditions included a restitution of $23,222.01 deducted from the contract by Change Order F as a credit for the use of shorter piles (see finding 9, supra). Also see finding 15, supra, for a discussion of $39,744.83 paid for by Change Order J which was in excess of what the plaintiff paid its piling subcontractor.
39. On April 4, 1955, Mr. Evans of the Bureau of Yards and Docks wrote to plaintiff as follows:
The District Public Works Office of the Fifth Naval District has forwarded to the Bureau your letter of 21 March 1955 concerning the release and Change Order “J” on Contract NOy-27276. In order that there may *187 be no possible ambiguity and misunderstanding, the Bureau is originating this letter and is requesting the District to send you new copies of the release and change order for reexecution.
As you requested at your meeting in Washington in September 1954, the Bureau by the final decision, Change Order “J” and release, has attempted to arrive at a fair settlement of your claims, which settlement will be final subject to the exceptions listed on your release. The matters which are to be left open are those expressly set forth on the release, and the Bureau understands that these exceptions are agreeable to you; however, in order that there may be no misunderstandings or ambiguities, you should agree that the exceptions as listed on the release are the only unsettled matters left outstanding under your contract.
The Bureau confirms your understanding that the description of the voucher as the “final voucher” does not in any way detract from the rights retained by you as listed in the release.
You must appreciate that the Bureau is not insisting that you give up your rights to have your claims determined by the Armed Services Board of Contract Appeals or by any other available forum rather than by the proposed settlement made to you by the change order and release previously presented to you. In arriving at its final decision, the Bureau resolved certain legitimate doubts in your favor, therefore, Change Order “J” is deemed a fair settlement of all of your claims under the contract. The Bureau does not admit that you are entitled to additional reimbursement for breach of contract; however, such claims cannot be adjudicated within the Department of the Navy and respecting your wish to be permitted to pursue other remedies, appropriate exceptions, as agreed to by you, have been included in the release.
By copy of this letter the Fifth Naval District is being requested to send you new copies of the release and change order for execution.
40. Although on March 15, 1955, the plaintiff had formally protested the Contracting Officer’s final decision of March 11, 1955 (findings 33 and 35, supra), on April 11, 1955, the plaintiff again formally protested the same decision in a letter adding nothing to the earlier protest.
41. By this time the plaintiff was being pressed for payment by its piling subcontractor and its surety was urging *188 it to execute whatever documents were necessary to secure final payment from the defendant. The plaintiff had been informed that payment was being withheld because of its pending appeal, and on May 6, 1955, the plaintiff wrote a letter to the Bureau of Yards and Docks seeking final payment, in effect.
42. On May 17, 1955, the plaintiff executed the following release:
CONTRACTOR’S RELEASE

Contractor's Release Under Contract NOy-87%76

Know All Men by These Presents : In consideration of the sum of Seventy-seven Thousand Five Hundred Ninety-three and 74/100 Dollars ($77,593.74), lawful money of the United States of America (hereinafter called the Government), to be paid by the Government under the above mentioned contract, the undersigned contractor does, and by the receipt of said sum shall, for itself, its successors and assigns, remise, release and forever discharge the Government, its officers, agents and employees, of and from all liabilities, obligations and claims whatsoever in law and in equity, including all rights under appeal to the Secretary of the Navy under ASBCA Nos. 1115,1457 and 1584, and all claims and appeals in Conn Structors’ letter of 11 April 1955 to the Honorable Charles S. Thomas, under or arising out of said contract, except:
1. All rights with respect to claim for return of $17,808.89 deducted by the Government for elimination of gravel and sisal paper now before the Secretary of the Navy under ASBCA No. 1499.
2. Any rights in the courts for damages for breach of contract and any rights for relief by the Congress.
In Witness Whereof, this release has been duly executed this 17 day of May, 1955.
(Indecipherable signature)
Contractor: Conn Structors.
By: E. G. Conn (SGD.).
Title: Partner.
Date: May 20, 1955.
Receiver: (Indecipherable signature)
43. Plaintiff was paid the contract price, plus or minus the allowances and deductions under the change orders.
*189 CONCLUSION OF LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of seventeen thousand, four hundred eighty nine dollars and forty seven cents ($17,489.47).

 At trial the plaintiff announced its intention to amend the petition to name the Bank as co-plaintiff, but it has not done so.

 At a subsequent trial stage (transcript page 169) the plaintiff announced its Intention to amend Claim A of the petition to Increase the claim to $346,472.18, but it has not done so.

 In subsection 4-10 oí the specifications dealing -with the subject of “Floor Finishes” we find a reference to “aU concrete fioors throughout the building. Including those of the loading platforms * *

 20,000 cubic yards of excavation at $1.72 and 66,000 cubic yards of fill at $1.22.

 In its petition the plaintiff bases its claim for additional compensation for excavation and fill entirely upon the Contracting Officer’s finding of May 12, 1953, reducing the unit prices to $1.65 for excavation and $1.15 for fill. The petition was not amended in this respect. At trial and in its requested findings the plaintiff deserts this basis of claim, and relies upon a claim that the Contracting Officer failed to take compaction factors into consideration in arriving at the ultimate determination of quantities, as will appear in finding 28.

 Presumably this means that a cubic yard of excavation in place occupies 9.7 percent additional space after it is removed for hauling, and that a cubic yard of loose fill shrinks 28.8 percent when it is compacted after placement.